LEW LYLE HARR, JR., as Executor, etc., of LEW L. HARR, Deceased, Appellant, Respondent, *v.* WELLS-NEWTON NATIONAL CORPORATION, Respondent, Appellant, Impleaded with L. L. HARR CORPORATION OF NEW YORK, Respondent.

First Department, April 18, 1935.

*Thomas F. Compton* of counsel [*Satterlee & Canfield,* attorneys], for the plaintiff and the defendant Harr Corporation.

*Paul W. Williams* of counsel [*Samuel A. McCain* and *John P. Ohl* with him on the brief; *Cotton, Franklin, Wright & Gordon,* attorneys], for the defendant Wells-Newton National Corporation.

*Albert M. Lee* of counsel [*J. George Levy* with him on the brief; *Albert M. Lee,* attorney], for Henry Craig Fleming and others, as *amicus curiæ.*

TOWNLEY, J. This suit is brought by the executor of the payee of two notes against the maker, Wells-Newton National Corporation (hereinafter called Wells-Newton). The first cause of action in the complaint relates to a note for $16,500 dated March 19, 1930, made by Wells-Newton by L. L. Harr, president, and Dick Johnson, vice-president, and payable to L. L. Harr personally. The second cause of action involves a note similar in form for $5,000. The other two causes of action need not be considered. The money was advanced by the indorsement over to Wells-Newton by Harr, as president of L. L. Harr Corporation of New York (hereinafter called Harr Corporation), of two checks drawn to the order of Harr Corporation by H. L. Ruppert & Company, Inc.

The counterclaims litigated consist of a claim for damages against Harr for wrongfully commencing a receivership proceeding against Wells-Newton and a claim for damage for the waste of the assets of Wells-Newton while Harr was president. We agree with the learned trial justice that there was no evidence to support either of these counterclaims and that they were properly dismissed. The important question on this appeal is whether a defense to the notes was established.

In the spring of 1929 various people became interested in consolidating a number of plumbing concerns throughout the country. Wells-Newton National Corporation was organized in Delaware to acquire options to purchase these plumbing companies. The

funds necessary to exercise the options were to be obtained from Harr Corporation. On April 12, 1929, an underwriting agreement was made under which Harr Corporation agreed to buy. from Wells-Newton a total of 100,000 shares of its capital stock for. $2,500,000. By later agreements the time for performance by Harr Corporation was finally extended to May 15, 1930. The Harr Corporation performed its contract to the extent of selling only $1,300,000 worth of stock. Under the terms of the underwriting agreement, payments for and delivery of stock were concurrent conditions and it is conceded that in fact no stock was ever delivered by Wells-Newton which had not been paid for by the Harr Corporation at the time of delivery. There were no payments due Wells-Newton for stock delivered prior to March 3, 1930, the date of the first loan.

The two notes in suit represent an advance of $21,500 to Wells-Newton to take care of pressing obligations of two of its subsidiaries. Harr had been elected president of Wells-Newton on February 25, 1930, and on that day, before his election, the directors had passed a resolution permitting any two named officers to borrow money and to make and indorse notes on behalf of the corporation. This authority was deemed sufficiently broad by Harr to permit him to borrow money from himself on behalf of the corporation and to issue notes to himself in exchange therefor. The corporation undoubtedly received the entire sum of money for which notes were issued.

There is no substance to defendant's claim that as matter of law Harr as a corporate officer was unable to issue a valid note to himself. In the absence of any showing that Harr wrongfully used the proceeds of the checks which went into the treasury of Wells-Newton — and no such claim has ever been made — the loans are good and must be paid. As INGRAHAM, P.. J., said in his dissenting opinion in *Newman* v. *Newman* (160 App. Div. 331, 341): " Certainly the officers of a corporation are not prevented from loaning money to it and taking therefor obligations from the corporation for money so loaned to it. The fact that an officer of a corporation has in his possession a note of the corporation payable to his own order carries with it no presumption of illegality or lack of consideration." (See, also, *Converse* v. *Sharpe*, 161 N. Y. 571.)

Certain shares of stock were sold by Harr to raise $21,500 which was paid over to Wells-Newton. Defendant had claimed at the trial that this money was either loaned by Harr Corporation or was paid as a syndicate transaction. The case was left to the jury on a charge which instructed them to find for the defendant if they believed from the evidence that Harr Corporation had made

the loans or if they believed that the money had been advanced to satisfy part of Harr Corporation's obligation under the syndicate agreement.

There is no direct proof in support of either of these defenses. The only circumstantial proofs are the facts that the stock sold stood in the name of the Harr Corporation, that the check delivered to Wells-Newton was payable to Harr Corporation and that certain bookkeeping entries in the books of Wells-Newton indicated that the money came from Harr Corporation. The bookkeeping entries were, it seems, to identify the checks with which the payments had been made. The other two facts are discussed later in this opinion.

The claim that this transaction was a loan from the Harr Corporation is not seriously argued on this appeal. Indeed, there was no obligation on the part of the Harr Corporation to lend money. Its entire obligation was to purchase stock.

The claim now relied on is that the sale of the stock and resulting payment to Wells-Newton were syndicate transactions. The difficulty with this contention is that the terms of the underwriting agreement expressly negative the possibility of a syndicate transaction being carried out in this form. It is conceded that at the time this payment was made no money was due Wells-Newton on account of stock previously delivered. The payment could not have been in discharge of any such obligations. The Harr Corporation was not in default under the provisions of the underwriting agreement requiring it to take and pay for $2,500,000 of stock because the agreement had been extended beyond the date when these transactions occurred. No payment was due under any provision of the contract. The stock which was sold concededly had been already purchased and paid for by the Harr Corporation under the terms of the syndicate agreement. Wells-Newton had no interest in and no right to the proceeds of the sale of this stock. There is no conceivable transaction under the terms of the syndicate agreement which would have taken the form this transaction took in the light of the conceded facts.

The uncontradicted explanation for the peculiar form of the loan transaction is as follows: Late in 1929, Harr Corporation, because it had invested all of its available funds in Wells-Newton stock under the syndicate agreement, was short of cash. It accordingly adopted the plan of paying salaries to some of its officers by delivering to them shares of Wells-Newton stock which Harr Corporation had already paid for and owned. Under this arrangement, in December, 1929, Harr was voted some 3,000 shares of Wells-Newton stock in lieu of salary. These shares were carried in the name of Harr Corporation and were indorsed in blank. When

Harr received them the registered owner's name was not changed but the shares were deposited in Harr's own safe deposit box. After it became necessary in March for Harr, as president of Wells-Newton, to lend money to it, some of these shares were sold by Harr through the Harr Corporation as broker to H. L. Ruppert & Company, Inc. About $38,000 was realized on these sales. Of this amount, $27,500 was paid to Wells-Newton by two checks; one on March third for $11,000 and one on March nineteenth for $16,500. These checks were drawn by H. L. Ruppert & Company, Inc., payable to Harr Corporation. Harr indorsed the checks as president of Harr Corporation, and gave the checks in that form to Wells-Newton. On the occasion of March 3, 1930, the check was for $11,000 and the loan for only $5,000. Harr received from Wells-Newton a note for $5,000 and an exchange check in the amount of $6,000 to cover the balance of the $11,000. The bookkeeper of Wells-Newton deposited the H. L. Ruppert & Company, Inc., checks in a Chicago bank for the account of Wells-Newton after preparing the necessary deposit slips. On the occasion of March 19, 1930, the loan was in the exact amount of the check, $16,500. Practically the same circumstances surrounded the making of the $16,500 loan, and the same procedure was followed in making the note and depositing the money therefor as on the occasion of the making of the $5,000 loan and note.

The testimony as to the ownership of the money lent was not contradicted in any way and must be taken as true. (*Hull* v. *Littauer*, 162 N. Y. 569.)

The final fact urged and perhaps the only one on which the defendant places great reliance is the testimony of Ruppert that he bought stock from Harr upon the understanding that the sale of this stock was in performance of the underwriting agreement. Needless to say, it would be immaterial who Ruppert understood was the owner of this stock. Harr wanted to raise cash to lend it to Wells-Newton for conceded pressing business needs of Wells-Newton. Ruppert was told to market some of the stock. The testimony of one Davis, concerning the sale of this stock, though denied by Ruppert, is significant: " Q. And please tell what was said, just in regard to the sale of that stock? A. This was immediately after the February meeting of the plumbers, the directors' meeting in February, 1930, and in the evening after the first meeting, at the Blackstone Hotel where we were all staying, Mr. Harr told Mr. Ruppert and myself he had a certain number of shares that he wanted to sell; to help us get started selling he would sell those personal shares of his for a lower price than the regular scheduled price, at $55 a share, which he said was his cost,

and we could have all over that. Q. What did Mr. Ruppert say? A. Well, it was very agreeable, and we decided to go out next week and see if we could sell them. Q. And were you a party to the understanding by which this should be sold? A. Yes, sir. Q. And did you thereafter sell any stock? A. I did."

Ruppert who had been made a director of Wells-Newton by Harr but who had become at the time of the trial very hostile to him was asked concerning his conversations with Harr about this stock: " Q. Did he tell you whose stock it was that he was selling you? * * * A. No, sir, he did not. * * * Q. Would you have bought any stock of Mr. Harr had you thought it was his personal stock? A. No, sir. * * * Q. Did Mr. Harr tell you that this stock was being sold to you under the underwriting agreement? * * * A. Certainly. * * * Q. Did you talk about the underwriting agreement? A. Certainly I talked about the underwriting agreement. The idea was to sell stock under that agreement."

We thus have the statement by Ruppert that the intention was to sell under the underwriting agreement and that he did not know whose stock he was selling. The underwriting agreement was between Wells-Newton and Harr Corporation. Harr Corporation's duty under that agreement as far as Wells-Newton was concerned was completely satisfied when it received stock and paid for it at the time of delivery. Ruppert as a director of the company and as a man who was selling this stock knew perfectly well that any stock that came into his hands through Harr Corporation had been paid for and was not being sold under the syndicate agreement in the sense that the proceeds of it were due Wells-Newton. The proceeds might be owing to anybody. Accordingly, the testimony of Ruppert has no probative force to establish that this loan was a payment by the Harr Corporation.

There is testimony by some of the directors that they knew that Harr was making the loans. Certainly, the directors Rose and Johnson knew that loans were being made for the benefit of the subsidiary companies of which they were in charge. Some interest was paid on the notes. At no time during Harr's presidency was there any claim that these were not *bona fide* loans made by Harr to the company.

If further argument is necessary, the underwriting agreement itself provides that payments under it be made in New York city to the Equitable Trust Company, the registrar. Such payments were deposited in a special account subject only to withdrawal upon the joint check of Wells-Newton and the Harr Corporation. The money loaned in this case was paid over in Chicago and was deposited

in Wells-Newton's regular account, subject to withdrawal by its check alone. Furthermore, the Harr Corporation did not designate in writing to the Corn Exchange Bank and Trust Company, the transfer agent, the number of shares or the denominations in which such shares were to be issued. Nor did the Harr Corporation ever demand any delivery of stock. To consider this money as an advance under the syndicate agreement, one must assume that the parties violated all the provisions under which such payments were to be made. There was no reason for so doing and nothing to show any such intention.

On this state of facts, there was nothing to leave to the jury concerning the ownership of the proceeds of the checks which went into the treasury of Wells-Newton. The record shows that L. L. Harr was completely innocent of any intention to trick Wells-Newton in any way and that he made a *bona fide* loan of his own money.

The judgment so far as appealed from by the plaintiff and the order denying motion to set aside verdict, should be reversed, with costs, and judgment directed for the plaintiff as prayed for in the complaint, with costs. The judgment in so far as it dismisses all the counterclaims of defendant Wells-Newton National Corporation should be affirmed. The order severing the action should be affirmed.

MARTIN, P. J., MERRELL, GLENNON and UNTERMYER, JJ., concur.

Judgment so far as appealed from by the plaintiff and the order denying motion to set aside verdict reversed, with costs, and judgment directed for the plaintiff as prayed for in the complaint, with costs. Judgment in so far as it dismisses all the counterclaims of defendant Wells-Newton National Corporation affirmed. The order severing the action affirmed. Settle order on notice.